```
IN THE UNITED STATES DISTRICT COURT

    FOR THE DISTRICT OF ALASKA


ELISHA SHEPHERD,                )
                                )
          Plaintiff,            )
                                )
     vs.                        )
                                )
MILTON J. JAKEWAY, and          )
UNITED STATES OF AMERICA,       )
                                )
          Defendants.           )
_____)
Case No. A01-333 Civil (JKS)
```

**CORRECTION SHEET:**
☒ Signature waived/time expired
☐ Signature waived
☐ Signed/dated/no corrections made
☐ Signed/dated/corrections made

ORIGINAL

---

DEPOSITION OF MILTON JAKEWAY
VOLUME I

---

Pages 1 - 74
Monday, March 24, 2003
11:00 A.M.

Taken by Counsel for Plaintiffs
at
Law Offices of Yale H. Metzger
425 G Street, Suite 510
Anchorage, Alaska

PACIFIC RIM REPORTING   907/272/4383
www.courtreportingalaska.com



EXHIBIT D

1    in handcuffs.  Did you take him out of the building?
2        A.    I did not escort him out of the building,
3    no.
4        Q.    Okay.  Somebody did?
5        A.    Yes.
6        Q.    Okay.  What did you do next?
7        A.    When Mr. Shepherd was standing up, he made a
8    spontaneous statement that he had assaulted his wife,
9    pushed her into the gun cabinet, causing the pane to
10   dislodge.  I noticed that.
11             Once he was actually secured with his hands
12   cuffed behind his back, I went downstairs.  I made
13   radio contact with the MP station to let them know the
14   situation.  I also instructed Sergeant Shaw and
15   another MP to go upstairs and assist Wisel.
16             Ms. Birt said that we needed to search for
17   other weapons, and so I went back upstairs.  I looked
18   in the gun cabinet because I had seen the gun
19   cabinet.  He had drawn my attention to it when he made
20   that statement.
21             I found three firearms in that cabinet.  I
22   also saw an unmarked videotape sitting on the floor
23   behind the gun cabinet, between the gun cabinet and
24   the wall.  It was in plain view.  Picked up the
25   videotape.  Didn't have any marks on it and -- or any

1    A.    No.

2    Q.    So Ms. Birt told you that she had obtained
3 consent from someone to conduct a search?

4    A.    My understanding. I don't remember the
5 exact words, but that was my understanding, yes.

6    Q.    Now, this is very important that you
7 distinguish from -- what you remember from what you
8 don't remember. Did Ms. Birt tell you that she had
9 obtained someone's consent to conduct a search?

10    A.    Yes.

11    Q.    You distinctly remember her telling you that
12 she had obtained consent to conduct a search?

13    A.    Yes.

14    MR. POMEROY:  Do you want to clarify what
15 time frame?

16    MR. METZGER:  Well, at any time.

17    MR. POMEROY:  Okay.

18    THE WITNESS:  Yes.

19 BY MR. METZGER:

20    Q.    Okay. And when did she tell you this?

21    A.    She told me that we needed to search while
22 we were at the quarters. And then later on, that she
23 further explained that Mrs. Shepherd had given her
24 consent.

25    Q.    So you didn't learn about the consent,

1   alleged consent, until after you conducted the search.
2   Is that right?
3       A.   I don't -- I know specifically after, when
4   we were doing our after-action review, she
5   specifically said that Ms. Shepherd is the one that
6   gave her the consent.  I don't remember the verbiage
7   verbatim what she told us except that we needed to
8   search the residence for weapons, and that's why we
9   did that.
10      Q.   Did she tell you that you needed to search
11  the residence for videotapes?
12      A.   No, she did not.
13      Q.   Did anybody ever tell you that Mrs. Shepherd
14  said to search the residence for videotapes?
15      A.   No.
16      Q.   Now, if I understand, when you found this
17  videotape, it was behind the gun cabinet, between the
18  gun cabinet and the wall.
19      A.   Right.
20      Q.   Is that right?  How was that in plain view?
21      A.   If you refer back to the sketch.
22      Q.   All right.
23      A.   Here's the entrance to the -- go through the
24  entrance.
25      Q.   All right.

1  downstairs.
2      Q.    Do you remember anybody besides yourself,
3  Mr. Shepherd, Ms. Birt or Mr. Wisel being in the
4  master bedroom?
5      A.    There was one other MP with Shaw when he
6  came upstairs.
7      Q.    Okay.  But that MP left with Shaw when they
8  took Mr. Shepherd away, didn't he?
9      A.    Right.  I was never alone in the master
10  bedroom by myself, if that's where you're going, sir.
11      Q.    I wasn't, but okay.  So if Sergeant Shaw
12  and the other MP led Mr. Shepherd away and Ms. Birt
13  and Mr. Wisel went outside, you would have had to have
14  left also?
15      A.    I was downstairs on the first floor of the
16  residence, as it reflects in my report, contacting the
17  MP station on the radio.
18      Q.    At some point did Mr. Wisel come back into
19  the building?
20      A.    Yes.  Both of them did.  Ms. Birt and Wisel
21  came back into the building.
22      Q.    And did Ms. Birt and Mr. Wisel both come
23  back upstairs?
24      A.    Yes.
25      Q.    Did you accompany them?

1   evidence of, quote, these crimes, unquote.  Is that
2   right?
3       A.   Yes, sir.
4       Q.   And these crimes were what?
5       A.   I don't know the exact verbatim of what it's
6   called under UCMJ, but under Article 134, it's against
7   UCMJ to harm yourself.  There was also domestic
8   violence assault, and later on we learned that all the
9   weapons in the house were not registered, which is a
10  violation of post policy.
11      Q.   So you were conducting a search for
12  evidence of those crimes, right?
13      A.   Yes, sir.
14      Q.   But you didn't have a warrant to conduct a
15  search for evidence of those crimes, did you?
16      A.   I did not have a warrant, no, sir.
17      Q.   You did not have anyone's authorization or
18  consent to search for evidence of those crimes other
19  than for firearms, did you?
20      A.   At that particular time, just like I
21  explained to you, Ms. Birt told us to look for
22  weapons, and I showed her the videotape and asked, "Do
23  we need to view this?"  Okay.  I was not present when
24  she got the consent to search, and I didn't know all
25  the limitations of what the consent was given.

```
 1      Q.   You were searching for evidence of all the
 2   crimes that you were aware of, right?
 3      A.   Yes, sir.
 4      Q.   Okay.  And the search wasn't limited to just
 5   the bedroom, was it?
 6      A.   In my mind it was because that's where we
 7   found the suspect with the weapon.
 8      Q.   But eventually the whole quarters were
 9   searched?
10      A.   But not by me.
11      Q.   Right.  But in some form, the entire
12   quarters were searched, right?
13      A.   I believe so, yes.
14      Q.   Now, I said -- going on, reading the answer,
15   "Prior to the initiation of this search incident to
16   apprehension, Plaintiff Elisha Shepherd consented to
17   the search of her property for weapons."  Period,
18   unquote.
19      A.   That is what I was told after the fact.
20      Q.   So after the fact, you learned that the
21   scope of the search was limited to weapons?
22      A.   Yes.
23      Q.   I think you testified yesterday that you
24   might have some materials from some of the training
25   that you received in the Army.  Is that right?
```

```
 1    I'd have to look in my boxes.
 2             MR. POMEROY:  We can supplement discovery
 3    requests if you do have some.
 4             THE WITNESS:  Okay.
 5    BY MR. METZGER:
 6       Q.    To your knowledge, did anyone ask for or
 7    seek or obtain Mr. Shepherd's consent to perform any
 8    search of the residence that evening?
 9       A.    I don't know if anybody asked him.
10       Q.    Do you believe that he had the capacity to
11    consent to a search of his residence that evening?
12       A.    I believe that he did.  I don't know.
13       Q.    But you didn't ask him for consent to search
14    his residence for anything?
15       A.    I did not, no.
16       Q.    In your interrogatory answer, you stated
17    that -- you used the words "incident to apprehension"
18    in describing the search.  Do you believe that you can
19    search a house or dwelling unit, the entire dwelling
20    unit if you apprehend someone in that unit incident to
21    the apprehension?
22       A.    Not the entire house.  Just where he is at;
23    reach, lunge or grab.
24       Q.    And was that your understanding back when
25    the Shepherd incident occurred, or was that --
```

 1      A.      Yes, sir.
 2      Q.      -- your understanding now?  Because you've
 3   had more law enforcement training since then.
 4      A.      That was my understanding then, sir.
 5      Q.      Okay.  And is it your understanding that you
 6   can search for where you can reach, lunge or grab for
 7   weapons for your protection?
 8      A.      Weapons and evidence of the crime.
 9      Q.      When you arrived at the scene, before you
10   entered the residence, were you ever introduced to
11   Mrs. Shepherd?
12      A.      No.
13      Q.      To this day, have you ever been introduced
14   to Mrs. Shepherd?
15      A.      Not that I recall.  I've never met her.
16      Q.      Was Ms. Birt present when you arrived at the
17   residence?
18      A.      Yes, she was.  She was inside the house.
19      Q.      Was there another CID agent present when you
20   arrived?
21      A.      Agent Lowery was approaching the scene.  I
22   don't think that he had actually arrived physically.
23   I think he was still driving up the street by the time
24   I went in the house.  I never spoke with him.
25      Q.      Did you see a group of people with a