1    MR. METZGER:  I'm inclined to agree with counsel's

2  objection, Your Honor, and withdraw the question.

3  BY MR. METZGER:

4  Q    The -- let me ask you this.  If you read that statement and

5  you had written it, if you read the statement:

6        "An unlabelled VHS tape was located near the gun

7        cabinet.  A check of the contents of the VHS tape

8        revealed it contained recordings of SPC and Mrs.

9        Shepherd engaged in sexual intercourse."

10  Would you have any idea of how much of the tape was reviewed?

11  A    No, sir.

12  Q    All right.  You and -- you and Agent Birt never discussed

13  that the tape might contain a suicide note at the Shepherd

14  residence, did you?

15  A    No, we did not.

16  Q    You never said "suicide note" in conjunction with "check

17  out the tape"?

18  A    No.  I just showed her the tape and she told me to check it

19  out.

20  Q    So the first time the words "suicide note" were mentioned

21  in conjunction with the tape was sometime after you left the

22  Shepherd residence?

23  A    I believe so.  I'm not 100 percent sure, but it was after

24  that.  Yes, sir.

25  Q    Back at the station when you were writing the report or

EXHIBIT D
PAGES AS MARKED

Jakeway - Direct                                          45

1   Q    Now your report -- you said that the tape revealed it

2   contained recordings of Special- -- SPC.  Is that an

3   abbreviation for Specialist?

4   A    It is, sir.

5   Q    Specialist and Mrs. Shepherd engaged in sexual intercourse.

6   You didn't write in there "appeared to be," did it -- did you?

7   A    No, sir.  That was an error on my part.

8   Q    Or it was because you knew it was Mr. and Mrs. Shepherd in

9   the video tape; right?

10  A    I had never met them.  I did not know, sir.

11  Q    All right.  But if you had read their name on the label of

12  the tape, you would have known who was on the tape, wouldn't

13  you have?

14  A    There was no label on the tape, sir.

15  Q    Prior to this incident, had you ever had any experience

16  with people video-taping themselves engaged in sexual

17  relations?  I mean, were you aware that people did it?

18  A    I was aware that people did it, yes.

19  Q    All right.  And when people do -- have put that on a video

20  tape, is that something that -- a tape that they might not

21  leave laying around where anybody and everybody could pick it

22  up?

23          MS. LINDQUIST:  Objection; calls for speculation.

24          THE COURT:  I think that is speculative.

25          MR. METZGER:  All right.  I'll withdraw the question.

Jakeway - Direct                                    48

1    Q    That got your attention.

2    A    The location of where it was.

3    Q    With the exception of its location, was there anything else

4    about it that got your attention?

5    A    It was unlabelled.

6    Q    Okay.  Was there any -- was there anything about it, other

7    than its location, that caused you to think it might contain a

8    suicide note?

9    A    It was unlabelled.

10   Q    Which is the absence of anything that tells you that it's a

11   suicide note; right?

12   A    But it doesn't prove that it's not, sir.

13   Q    Right.  Okay.  With the exception of it being unlabelled

14   and lying on the floor between the gun cabinet and the wall,

15   was there anything that told you this contains a suicide note?

16   A    No, it did not.

17   Q    Was there anything that told you it didn't contain

18   Disneyland vacation images?

19   A    No, sir.

20   Q    Was there anything that didn't tell you that it contained

21   Mr. and Mrs. Shepherd engaged in sex?

22   A    There was no label and I had no idea what was on it.

23   Q    But whether it had Mr. and Mrs. Shepherd engaged in sex or

24   Mr. and Mrs. Shepherd at Disneyland, or Mr. and Mrs.

25   Shepherd -- or Mr. Shepherd video-taping a suicide note -- were